IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

| | |
|---|---|
| JEANETTE BIXLER, | CV 11-2-H-CCL |
| Plaintiff, | |
| vs. | |
| NEXT FINANCIAL GROUP, INC., a | OPINION & ORDER |
| Virginia corporation, GARY FALBER, | |
| RYAN FALBER,[1] and | |
| DOES 1 THROUGH 10, | |
| Defendants. | |

*******

Before the Court is Defendants' Motion to Compel Arbitration (Doc. 35).

Plaintiff opposes the motion.  The Court has heard oral argument from counsel and

received testimony from the parties on December 14, 2011, and January 11, 2012.

---

[1] Plaintiff dismissed the Complaint against Ryan Falber on January 7, 2011.
(Doc. 4.)

Defendants were represented at hearing by Michelle M. Arbitrio, and Plaintiff was represented at hearing by John Morrison and Linda Deola.  After reviewing the briefs and arguments of counsel and all the record, the Court is prepared to rule on the Motion.

In this case, the Court sits in diversity jurisdiction pursuant to 28 U.S.C. § 1332.  This Court has subject matter jurisdiction to determine the threshold question of whether a valid agreement to arbitrate exists.

The dispute in this case centers upon a Client Agreement between Plaintiff Jeanette Bixler, an individual investor, and Defendant Gary Falber, a securities broker and representative of NEXT Financial Group, Inc.  The purpose of the agreement was to establish a client-broker relationship between Gary Falber and Jeanette Bixler.  The first page is entitled "Account Information Form," and it incorporates by reference an attached privacy policy information sheet and a two-page document entitled "Client Agreement."[2]  (Def. Ex. B.)  Jeanette Bixler does

---

[2] Def.'s Ex. B.  Unless the reference to an exhibit is accompanied by a docket entry, all further references to exhibits shall be understood to refer to those

not dispute that she signed the Account Information Form or that she intended to make Gary Falber her broker.  Plaintiff does dispute, however, that she ever intended to purchase an annuity from him.  However, Plaintiff did sign a "JNL Fixed and Variable Annuity Application," and as a result she purchased a variable annuity from the Jackson National Life Insurance Company.

In her Complaint, Plaintiff claims that she was induced by actual fraud and deceit to purchase the variable annuity.  Plaintiff claims that Defendants breached their fiduciary duty to her and were negligent in their conduct toward her, also breaching the implied covenant of good faith and fair dealing and intentionally and negligently inflicting emotion distress.  Plaintiff claims that Defendants violated the Securities Act of Montana.  Plaintiff seeks to amend her Complaint in order to assert Montana Insurance Code violations, and the Court will address this request at the conclusion of this opinion.  Plaintiff agrees to arbitrate all but her claims grounded upon Montana insurance law.  Plaintiff asserts that Montana law

---

exhibits admitted during the hearing on December 14, 2011, and its continuance on January 11, 2012.

invalidates any agreement to arbitrate her insurance claims.

I.   <u>Discussion.</u>

The Federal Arbitration Act ("FAA") governs this dispute.  9 U.S.C. § 1, et seq.  By enacting the FAA, Congress has set a policy favoring arbitration unless grounds exist at law or in equity to revoke the contract.  9 U.S.C. § 2.  In *Southland Corp. v. Keating*, 465 U.S. 1, 4-5, 104 S.Ct. 852, 79 L.Ed. 1 (1984), the United States Supreme Court held that the FAA "create[d] a body of federal substantive law," which was "applicable in state and federal courts."  465 U.S. at 12, 104 S.Ct. 852 (internal quotation marks omitted).  State law (even state claims brought in state court) cannot bar enforcement of § 2 of the FAA.  *See id.* at 10-14, *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270-73, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).  Section 2 provides that

> A written provision in . . . a contract ... to settle by arbitration a
> controversy thereafter arising out of such contract ... or an agreement
> in writing to submit to arbitration an existing controversy arising out
> of such a contract ... shall be valid, irrevocable, and enforceable, save
> upon such grounds as exist at law or in equity for the revocation of

any contract.

Challenges that go specifically to the making of the agreement to arbitrate itself can be decided by a court. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). However, challenges against the contract generally must be decided by an arbitrator. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). Under state law, also, once an arbitration provision is determined to be valid, "challenges to the contract as a whole are properly decided via arbitration, given the existence of an arbitration clause." *Martz v. Beneficial Montana, Inc.*, 135 P.3d 790, 794 (Mont. 2006); *see also In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001).

II.    Arbitration Agreement in NEXT Client Agreement is Valid.

    A.    Findings of Fact.

The contract in question in this case consists of a one-page "NEXT Account Information Form" signed by Plaintiff (Doc. 37-2), that incorporates by reference

a two-page document titled "NEXT Client Agreement" (Doc. 37-4).  The

arbitration clause is contained within the NEXT Client Agreement as ¶ 20(A)-(J).

It provides that:

> **20.   Arbitration: This agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:**
>
>   **A.   All parties to this agreement are giving up the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
>
>   **B.   Arbitration awards are generally final and binding: a party's ability to have a court reverse or modify an arbitration award is very limited.**
>
>   **C.   The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.**
>
>   **D.   The arbitrators do not have to explain the reason(s) for their award.**
>
>   **E.   The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**
>
>   **F.   The rules of some arbitration forums may impose time limits for bringing a claim in arbitration.  In some cases, a claim that is ineligible for arbitration may be brought in court.**
>
>   **G.   The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.**
>
>   **H.   This agreement to arbitrate constitutes a waiver of the right**

to seek a judicial forum unless such a waiver would be void under the Federal securities laws.

I.     Any controversy arising out of or relating to my accounts, to transactions with you, your officers, directors, agents, employees, clearing agent, this Agreement or the breach thereof, whether such transaction or agreement was entered in prior, on, or subsequent to the date hereof, shall be settled by arbitration in accordance with the rules then in effect of the Financial Industry Regulatory Authority ("FINRA").  I understand that the FINRA eligibility requirement bars claims brought more than six (6) years after the event giving rise to the claim.  Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

J.     No person shall bring a punitive or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a punitive class action; or who is a member of a punitive class action who has not opted out of the class with respect to any claims encompassed by the punitive class action until: (I) the class certification is denied; or (ii) the class is decertified; or (iii) the client is excluded from the class by the court.  Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

(Doc. 37-4 at 2-3 (bolded in original).)

The Court finds that after a lengthy discussion between

Defendant Gary Falber and Plaintiff Jeannette Bixler, the Plaintiff decided to make

the Defendant her investment adviser.  Jeannette Bixler signed a form that she knew meant that Gary Falber and NEXT Financial were going to handle certain financial transactions for her.  Bixler knew that the Client Agreement contained an arbitration clause, which was explained in detail to her by Falber.  She knew that she was giving up her right to litigate in court any dispute that arose from her relationship with Gary Falber and NEXT Financial.

Gary Falber was a credible witness.  He was using the meeting with Bixler to train his son (a newly licensed securities broker) in the proper techniques of client interview and in the proper establishment of client relationship.  He had an extra incentive to follow proper procedures in signing up a new client.  Falber spent hours with Bixler and explained the Account Information Form and Client Agreement in detail, including the arbitration provision.  Falber did not apply undue pressure upon Bixler or cause her to suffer duress.  Having just experienced a loss of over $150,000 in the value of her stocks in the previous 12 months, Bixler brought into her meeting with Falber her keen desire to modify her investment portfolio to prevent future losses.

8

The Court finds that Bixler is a sophisticated investor.  She was not a credible witness.  Whenever Bixler was asked pointed questions on cross-examination, Bixler provided rambling, confusing, and non-responsive answers.  However, when asked peripheral, technical questions, Bixler demonstrated that her mind was sharp and that she did, indeed, possess a sophisticated understanding of her investments and the procedures related to purchasing and liquidating investments.  Bixler purchased stocks online utilizing the internet, and she had invested aggressively in ADRs, limited partnerships, real estate investments, and other investment vehicles that she learned about through friends, through her investment club, and through watching financial programs on television.  Bixler demonstrated during her testimony a strong ability to read her financial documents and to understand them.  She has a prior history of writing clear letters to her investment providers demanding changes to her accounts, as well as a history of writing effective letters to government agencies demanding oversight of her

investment providers.  Bixler declined to testify exactly to the extent of her assets,[3] but her testimony indicated that even though she had no current earnings to speak of (she is retired from all employment), she is by no means poor.

The Court finds that on March 9, 2009, the following occurred:  Falber explained the arbitration provision to Bixler, as well as the other significant provisions of the Client Agreement, and Bixler understood both the arbitration provision and the Client Agreement.  The Court finds further that Falber explained why he was recommending a variable annuity for Bixler, Bixler understood what a variable annuity was,[4] and Bixler agreed to purchase it.  Falber gave the variable annuity prospectus to Bixler on a CD.  Bixler signed numerous documents

---

[3] On direct examination, Bixler testified as follows:
Q.  That says that your net worth was 500,000 about and your liquid net worth was 280,000?
A. Uh-huh.
Q. And are those numbers accurate, roughly?
A. It depends upon which day it is, I guess.
(TRI 143:5-9.)

[4] Bixler had previous purchased annuities and had attended seminars regarding annuities.  (TRII 26:12-23; 27:9-10; 44:15-21.)

evidencing her understanding that she was going to liquidate her stock

investments at Charles Schwab and Waddell & Reed and use those funds to

purchase a variable annuity sold by Jackson National Life Insurance Company

("JNL").  Bixler signed an "Account Transfer Form" transferring all of her Charles

Schwab account to NEXT Financial.  (Ex. I.)  Bixler signed another "Account

Transfer Form" transferring all of her Waddell & Reed accounts to NEXT

Financial.  (Ex. J.)  Bixler signed a JNL "Fixed and Variable Annuity Application"

(Ex. 5), which application listed her two daughters as her beneficiaries.  Bixler

signed a JNL "Variable Annuity Non-Qualified Systematic Withdrawal Request."

(Ex. 8)  Bixler signed a JNL "Systematic Investment" form that provided for an

automatic transfer of premiums into selected funds.  Bixler signed a JNL "Request

for Transfer or Exchange of Assets" (Ex. 11) into the JNL annuity.  Bixler wrote a

check to "Jackson Natl Life" in the amount of $45,000 in order to bring the total

amount of the variable annuity to $210,000.  Bixler had 30 days to reconsider and

dissolve her relationship with Falber and NEXT Financial, as established on

March 9, 2009.  After she received her variable annuity contract confirmation

11

dated April 7, 2009, in the mail, she had a 10-day look-back period within which

to cancel that particular contract.  Bixler did not reconsider her client agreement

with Falber/NEXT in the thirty day period.  Bixler did not cancel her variable

annuity contract with JNL in the ten-day look-back period.  The Court finds

Bixler's testimony that she did not know what she was doing when she entered

into the JNL variable annuity contract not to be credible.  Bixler did not have any

problem with the variable annuity until about two months after she purchased it,

when, as Falber testified, the stock market began to recover.  (TRI 56:19-57:1.)

Bixler did not make a formal complaint about her purchase of the variable annuity

until July 2009.  (TRI 56:10-57:1.)

There is no doubt that the Client Agreement between Plaintiff and

Defendants contains an arbitration clause.  (Ex. D, Doc. 37-4, ¶ 20.)  The Account

Information Form (AIF) signed by Plaintiff contains this sentence in bold just

above her signature:

**I acknowledge that the Client Agreement includes a pre-dispute arbitration clause located in paragraph 20.**

/s/_____   _____

Client Signature (Client must also sign above)                    Date

(Ex. B, Doc. 37-2 (bolded in original).)   Plaintiff does not dispute that she signed

the contract or that the sentence above her signature is an acknowledgment that the

contract includes an arbitration clause.  The arbitration clause is applicable to both

parties and is even-handed, favoring neither party generally.  It simply and

accurately explains how arbitration differs from court proceedings, including the

waiver of the right to jury trial.  Under that arbitration clause, the time period for

initiating dispute resolution is six years.  (Ex. D, ¶20(I), Doc. 37-4.)

B.     Texas Law.

The AIF/Client Agreement has a choice-of-law provision that identifies the

law of Texas as governing the contract's interpretation.  We begin by consulting

the law of our forum state, which is Montana.  An application of §§ 187(2) of the

Restatement (Second) of Conflict of Laws, *see Casarotto v. Lombardi*, 868 P.2d

931, 934-35 (Mont. 1994), *rev'd on other grounds*, *Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), leads to the conclusion that Texas law governs the contract because the contract itself identifies Texas as the choice of law, and it is an effective choice because Texas has a substantial relationship to the parties and the contract, and Texas law would not contravene any fundamental policy of the State of Montana.  In this regard, Montana does not possess a materially *greater* interest than Texas in the parties and the contract.

   The Court has examined the five § 188(2) factors used to determine which state has a materially greater interest in the contract: (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.  *See Keystone, Inc. v. Triad Sys. Corp.*, 971 P.2d 1240, 1242 (Mont 1998) (citing § 188(2)(a)-(e) Restatement (Second) of Conflict of Laws).  These factors are not to be applied mechanistically but qualitatively (based on the nature of the contract) in deciding which state has

14

the most significant relationship to the parties and the contract.  *See  Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 468 (3rd Cir. 2006) (citing *Cipolla v. Shaposka*, 267 A.2d 854 (Pa. 1970)).   The Court finds that (1) the contract was prepared in Texas and signed in Montana, (2) there were no negotiations, (3) the place of performance is both in Montana, where Plaintiff made one payment to Defendants and where Plaintiff may receive future payments, and Texas, where the initial administration of the contract occurred and the payment was received, (4) the subject matter is not a specific physical thing having an actual location, and (5) Plaintiff is a citizen of Montana, and NEXT is organized under the laws of Texas, is headquartered in Texas, and has its principal place of business in Texas.

Not only does Texas have a substantial relationship to the parties and transaction, as is required by the Restatement (Second) of Conflicts of Law § 187(2), but also, the application of Texas law would not contravene a Montana fundamental policy.  It is the fundamental policy of Texas to protect investors. *See In re Enron Corp. Secs.*, 235 F.Supp.2d 549 691-92 (S.D. Tex. 2002) (holding that "the Texas [Securities Act] is a broad remedial statute intended not only to

15

protect Texas residents but also non-Texas residents from fraudulent securities practices emanating from Texas.").  Furthermore, the Texas Securities Act is also protective of investors, and arguably just as protective as the Montana Securities Act.  Tex. Rev. Civ. Stat. Ann. Art. 581-10-1B (general purpose of the Texas Securities Act is to protect investors); *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 115 (Tex. 1971) (holding the Texas Securities Act's purpose is to regulate securities' sales and to protect investors from fraud).  Thus, the Court finds that both the State of Texas and the State of Montana have substantial interests in this contract, that the law of Texas is not contrary to a fundamental policy of Montana, and that the interests are relatively evenly balanced, neither state having a materially *greater* interest than the other.  In such a circumstance, pursuant to the law of our forum state, Montana, as it has adopted § 187(2) of the Restatement (Second) of Conflict of Laws, the choice-of-law provision of the contract should govern, which means that the law of Texas should be consulted to resolve the parties' disputes.

The Court might add that, despite Plaintiff's contention otherwise, even if

16

Montana law applied to this dispute, there would be no different outcome under Montana law on the motion to compel arbitration than under Texas law.  Montana cases "have consistently held that arbitration agreements between two parties are valid and enforceable." *Gordon v. Kuzara*, 245 P.3d 37 (Mont. 2010) (citing *Burkhart v. Semitool, Inc.*, 5 P.3d 1031 (Mont. 2000)).  It is true that Montana public policy forbids enforcement of arbitration clauses in adhesion contracts wherein the arbitration clause "lacks mutuality of obligation, is one-sided, and contains terms that are unreasonably favorable to the drafter." *Ticknor v. Choice Hotels Intern., Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (quoting *Iwen v. U.S. West Direct*, 977 P.2d 989, 996 (1999)).  However, in this case, the Court does not find that Montana public policy is offended by this arbitration clause, because this arbitration clause does not meet the *Iwen* criteria.


C.     Montana Law.

In considering the choice-of-law question, the Court has considered the contract under Montana law and has concluded that even under Montana law the

17

agreement to arbitrate would be valid.

This contract is an adhesion contract in that the form of the contract was prepared by Defendant NEXT, there was no negotiation as to its contents, and Plaintiff only had the choice to accept or reject the contract. *See Zigrang v. U.S. Bancorp Piper Jaffray, Inc.*, 123 P.3d 237 (Mont. 2005) (citing *Kloss v. Edward D. Jones & Co.*, 54 P.3d 1 (Mont. 2002)).  However, the fact that it is a contract of adhesion does not thereby render it unenforceable. *See, Iwen v. U.S. West Direct*, 977 P.2d 989, ¶ 28 (Mont. 1999) ("the doctrine of adhesion itself does not constitute a sufficient basis for invalidating a contract....")*.*  Instead, a contract of adhesion becomes unenforceable against the weaker party "if it is (1) not within their reasonable expectations, or (2) within their reasonable expectations, but, when considered in its context, proves unduly oppressive, unconscionable, or against public policy." *Zigrang*, 123 P.3d at ¶ 13.  Because it is both a state and federal policy to favor arbitration, however, it cannot be said that an arbitration clause in an adhesion contract is *per se* unconscionable.

Under the particular circumstances of this case, it appears that Plaintiff

18

could have reasonably expected an arbitration clause when insurance and investment sales contracts often contain arbitration clauses and Plaintiff had prior experience with multiple investments.  Moreover, the last bolded sentence above her signature on the AIF informed her that the contract did, in fact, contain such a clause.  As to the general nature of the contract itself, Plaintiff actually knew that Defendants were going to become her brokers and purchase a variable annuity product for her because she signed the application to purchase a variable annuity, signed the forms to liquidate and/or transfer her stocks to NEXT, and she gave them a check made out to "Jackson Natl Life" for $45,000, post-dated for twenty-five days later.  (Defendants agreed to, and did, hold the check for the requested time period.)  As to any defense of duress, it bears mentioning that Plaintiff was unhappy with her current investment portfolio and wanted to make a change, and she did have the option of not entering into the contract with Defendants at all, thereby maintaining her investments with Charles Schwab and Waddell & Reed. (Doc. 44-2, ¶ 10.)  Clearly, the general features of this transaction were within Plaintiff's reasonable expectations.

19

The issue then becomes whether the contract was unconscionable, and, indeed, Plaintiff stresses certain factors, such as her age, her low income, and the long-term nature of the investment vehicle to argue that the contract is indeed unconscionable.  (Doc. 44-2.)  In Montana, unconscionability in a contract turns on whether "the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions."  *Iwen*, 977 P.2d 989 at 521 (quoting *Leibrand v. National Farmers union Property & Casualty Co.*, 898 P.2d 1220, 1227 (citation omitted)).  Here the contract as a whole is not unreasonably favorable to the drafter, and, in fact, the Client Agreement does not by its terms become "conclusive" until 30 days after the contract is signed, presumably to grant the investor a grace period within which to reject or modify the contract.  Doc. 37-4 at 3.  The arbitration clause also does not unreasonably favor the drafter.  It is simple and straightforward, and it applies to both parties evenly.  Doc. 37-4 at 1-2. Neither do the essentials of the transaction strike the Court as unreasonably favoring the drafter: While Plaintiff was choosing an investment vehicle that had a

20

lengthy term prior to payout, the product would preserve the value of her initial

investment at a time when markets were volatile and investors were nervous.  The

annuity gave her access to ten percent of the principal without penalty each year.

(TRI 53:22-25.)   A program of ten percent withdrawal per year would have been

more than Plaintiff withdrew from her previous variable annuity (the AXA

annuity) in the prior decade, which annuity had now matured and was presumably

available for cash withdrawals if necessary.  (TRI 54:3-5.)  Meantime, Plaintiff

stated that she had assets of $500,000 and liquid assets of $260,000 with which to

make this purchase, so it does not seem to the Court that the investment vehicle

was so wildly unrealistic from Plaintiff's perspective as to make the contract

patently unconscionable under Montana law.

Plaintiff contends that Montana law, namely, Mont. Code Ann. § 27-5-114,[5]

---

[5]  M.C.A. § 27-5-114 provides in pertinent part:  "Validity of arbitration agreement – exceptions.  (2) A written agreement to submit to arbitration any controversy arising between the parties after the agreement is made is valid and enforceable except upon grounds that exist at law or in equity for the revocation of a contract . . . this subsection does not apply to: . . . (c) any agreement concerning or relating to insurance policies or annuity contracts except for those contracts

excludes disputes over annuity contracts from arbitration clauses.  In this case,

however, the arbitration provision is contained in the AIF/Client Agreement,

which has nothing itself to do with variable annuities.  Plaintiff's arbitration

agreement centers upon her client relationship with NEXT and any disputes

related thereto.  Therefore, Plaintiff's reverse preemption argument based on § 27-

5-114, Mont. Code Ann., is factually irrelevant because Plaintiff's agreement is to

arbitrate disputes about and emanating from her client relationship with Falber and

NEXT Financial.

In addition, Plaintiff's statutory argument must be rejected according to a

long line of Supreme Court cases, the last of which is the United States Supreme

Court's recent opinion in *AT&T Mobility, LLC v. Concepcion*, 2011 WL 1561956,

131 S. Ct. 1740 (Apr. 27, 2011), which holds that a state law that stands as an

obstacle to the purpose of Congress in enacting the FAA, cannot be used to

override arbitration agreements.  In *Concepcion*, the Court's discussion

---

between insurance companies[.]"

22

encompasses state anti-arbitration statutes among those state laws preempted by the FAA, and the Court states definitively that such laws are preempted:  "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward:  The conflicting rule is displaced by the FAA." *Concepcion*, 131 S. Ct. 1740, at *6; *see also Volt Information Sciences v. Board of Trustees*, 489 U.S. 468, 474, 109 S. Ct. 1248, 1253, 103 L.Ed.2d 488 (1989) (FAA preempts state legislative attempts to limit enforceability of arbitration agreements).

Plaintiff also argues that the McCarren-Fergusen Act ("MFA") requires a reverse preemption of the FAA by § 27-5-114, because the MFA provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance. . . ."  15 U.S.C. § 1012(b).  Plaintiff argues that § 27-5-114 is a Montana law enacted for the purpose of regulating the business of insurance, and therefore it reverse preempts the FAA.  In this case, the arbitration agreement does not pertain to an annuity

23

contract, and therefore it does not even implicate § 27-5-114, M.C.A.  In addition,

this Montana statute is found in Montana's Uniform Arbitration Act, not in the

Montana Insurance Code, and therefore the Court considers it highly unlikely that

this arbitration statute was enacted for the purpose of regulating the business of

insurance.  *See Northwestern Corp. v. Nat'l Union Fire Ins. Co.*, 321 B.R. 120

(2005)(holding that the Federal Arbitration Act trumps the McCarren-Fergusen

Act because Montana Insurance Code is Montana's exclusive method of

regulation of business of insurance and § 27-5-114 not enacted for purpose of

regulating business of insurance in Montana).

In this case, the anti-arbitration statute applicable to annuity contracts found

in Mont. Code Ann. § 27-5-114(2)(c) is preempted by the FAA, and therefore

§ 27-5-114(2)(c), M.C.A., would have no application to the motion to compel

arbitration even were Montana law applied.

Likewise, Plaintiff's reliance on *Willems v. U.S. Bancorp Piper Jaffray*, 107

P.3d 465 (Mont. 2005), and *Kloss v. Edward Jones*, 54 P.3d 1 (2002), to invalidate

the arbitration clause under Montana law runs afoul of the Supreme Court's

24

preemption prescription in *Concepcion*.  Citing *Kloss*, Defendant Falber acknowledges that he had a fiduciary relationship with Plaintiff because he was authorized to buy and sell in the client's account.  (Doc. 38 at 26.)  Citing *Willems*, Defendant Falber also acknowledges that Montana law requires a broker in a fiduciary relationship to advise the customer of the arbitration agreement.  (*Id.*) Notice was indeed given by the AIF document signed by Plaintiff because the arbitration notice was virtually impossible to miss.   (Doc. 37-2 at 2.)  The fact that Plaintiff claims that Defendant Falber did not specifically discuss with her all the details and ramifications of the arbitration clause (a claim that Defendant Falber vigorously contests) and that he had to do so because it was an *arbitration* clause creates the sort of obstacle to arbitration that *Concepcion* forbids.  In addition, the Court has found that Falber was a credible witness, and he testified that he did indeed explain the arbitration clause in detail to Bixler, and the Court so finds.

The Court concludes that both Mont. Code Ann. § 27-5-114, which excludes disputes over annuity contracts from arbitration clauses, and also the *Kloss* rule invalidating arbitration clauses when a broker acting as a fiduciary does

25

not adequately explain an arbitration clause to the client, are preempted by the

FAA.   Section 27-5-114 (2)(c) excludes annuity contract claims from arbitration,

and therefore it "appl[ies] only to arbitration...."  *See Concepcion*, 131 S.Ct. at

1746.  The *Kloss* rule is a "defense[] that ... derive[s] [its] meaning from the fact

that an agreement to arbitrate is at issue" and is therefore preempted.  *Id.* at 1746.


III.    <u>Whether the Client Agreement is Valid is an Issue for an Arbitrator to
       Decide.</u>

        Having decided that the arbitration provision in the Client Agreement is

valid, and Plaintiff Bixler did agree to arbitrate her disputes connected to the

Client Agreement, this Court need not press on further to decide whether the

Client Agreement is a valid contract, because that is a question for an arbitrator to

decide.  The issue of a contract's validity is considered by the arbitrator in the first

instance.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct.

1801, 18 L.Ed.2d 1270 (1967) (noting that arbitration provisions are severable as a

matter of substantive federal arbitration law).  Thus, any claims against the

contract as a whole, such as a claim of fraud in the inducement of the contract, are to be decided by the arbitrator.  *Id.* at 400, 402-43, 87 S.Ct. 1801.  So, too, the state law challenges against the contract in *Southland* (fraud, misrepresentation, breach of contract, breach of fiduciary duty) were determined by the Court to be arbitrable.  *Southland v. Keating*, 465 U.S. 1 (1984).  The U.S. Supreme Court clarified in *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204 (2006), "that the *Prima Paint* rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void."  *Buckeye Check*, 546 U.S. at 448-49 (holding that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.")

IV.   Arbitrability of Plaintiff's Claims

The gateway issue of whether an arbitration clause applies to a particular dispute are to be decided by courts.  *See Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion).  "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is

'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)).  In this case, there is no indication in the arbitration provision that the parties agreed to arbitrate arbitrability.  However, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).  We "construe ambiguities concerning the scope of arbitrability in favor of arbitration." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 66, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995).  So too, Montana's liberal policies favoring arbitration agreements include that of "resolving any doubts concerning the scope of arbitrable issues in favor of arbitration." *Kingston v. Ameritrade, Inc.*, 12 P.3d 929, 932 (Mont. 2000) (citing *Vukasin v. D.A. Davidson & Co.*, 785 P.2d 713, 718 (Mont. 1990)).  Under Texas law, also, a party

28

asserting an arbitration agreement must show that the agreement exists and that the claims fall within the scope of the agreement.  *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999), *abrogated in part on other grounds by* <u>*In Re Halliburton Co.*</u>, 80 S.W.3d 566 (Tex. 2002).

Defendants assert that Plaintiff's claims easily fall within the scope of the arbitration clause because they fall under "any controversy arising out of or relating to [Plaintiff's] accounts, i.e., transactions with [NEXT Financial], [NEXT Financial's] officers, directors, agents, employees, clearing agent, this Agreement, or the breach thereof, whether such transaction or agreement was entered in prior, on, or subsequent to the date hereof...."  (Doc. 37-4, ¶ 20(I).)  Conceding that her 'securities' claims may be arbitrated, Plaintiff asserts nevertheless that her 'insurance' claims are not within the scope of the arbitration clause, arguing that the clause explicitly states that it is governed by the arbitration rules of FINRA,[6] and FINRA rules exclude insurance law claims.  Defendants object to this

---

[6] The Financial Industry Regulatory Authority ("FINRA") is the arbitral body of the National Association of Securities Dealers, Inc. ("NASD").

reasoning, arguing that there is only one product that was sold (the variable annuity product), and it is a registered security even though it also functions as insurance in some respects.

The arbitration clause at issue here provides that "Any controversy . . . shall be settled by arbitration in accordance with the rules then in effect of the Financial Industry Regulatory Authority ("FINRA")."  (Doc. 37-4 at 3, ¶ 20(I).)  Plaintiff presents for the Court's consideration FINRA Rule 12200, which excludes from arbitration "disputes involving the insurance business activities of a member that is also an insurance company."  (Doc. 44 at 6.)  Plaintiff argues that because a variable annuity product is both a security and insurance, it falls within a category of claims that cannot be arbitrated by FINRA under its own rules.  Plaintiff implicitly acknowledges that Defendants NEXT and Falber are not "insurance companies," but Plaintiff asserts that they are "obviously associated with JNL [which is an insurance company]."  (Doc. 44 at 6.)  The Court notes that JNL is not a member of FINRA, however.

Doubt as to the scope of the arbitration clause should be resolved in favor of

arbitration.  *Raymond James & Assocs. v. Bowman*, 196 S.W.3d 311, 319 (Tex. App. Houston 1st Dist. 2006); *see also Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").  Plaintiff's argument is not entirely persuasive.  Variable annuity products are hybrid investment vehicles, at once insurance contracts and, at the same time, registered securities under the Securities Act of 1933.  (Def.s' Reply Brief, Doc. 47 at 8, citing FINRA Notices To Members 99-35 and 96-86; U.S. Securities and Exchange Commission, Annuities, [http://www.sec.gov/answers/annuity.htm.)](http://www.sec.gov/answers/annuity.htm.) Even when Plaintiff's insurance code claims are taken into consideration, such allegations still sound in tort and do not require special knowledge of insurance law.  (Doc. 47 at 8, citing *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc.*, 266 F.3d 645, 653 (7th Cir. 2001) (insurance business exception to arbitration not

applicable where no technical issue of insurance law).)  Indeed, the *IDS Life Ins. Co.* decision provides the further explanation that "[t]he purposes of the exclusion are to keep arbitrators away from issues that are peculiar to insurance, such as reserves, reinsurance, actuarial calculations, rates, coverage, and mandatory terms, and to prevent arbitrators from being swamped with insurance claims, which are apt to be more numerous than securities claims."  *IDS Life Ins. Co.*, 266 F.3d at 652 (citing *In re Prudential Ins. Co. of America Sales Practice Litigation All Agent Actions*, 133 F.3d 225, 232-34 (3rd Cir. 1997)).  Even the insurance agents' employment disputes that were referred to arbitration in the case of *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 232 (3rd Cir. 1998), were not held to be within the "insurance business exception" because they were not "insurance-only claims" or matters that were "intrinsically insurance".  *Id.* (quoting 44 Fed.Reg. 75,255 (1979)).

The Court concludes that Plaintiff's negligence and negligence *per se* 'insurance' claims are within the scope of the arbitration clause because the Defendants are not insurance companies and because the claims pertain to the sale

of a hybrid security/insurance product, but do not import technical insurance matters into the tort and contract claims.  Although there may be some small doubt as to the scope of arbitration, this Court must resolve that doubt in favor of arbitration.  *See Raymond James & Assocs. v. Bowman*, 196 S.W.3d 311, 319 (Tex. App. Houston 1st Dist. 2006); *see also Moses H. Cone Memorial Hosp. v. Mercury Const. Corp*., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983). Therefore, the Court will deny Plaintiff's request to specifically exclude all her insurance allegations from arbitration.

V.    Motion to Amend Complaint

The Court notes that currently Plaintiff has one count of Negligence (Count VI) and one count of negligence *per se* (Count XIII), either of which can encompass violations of Montana's Insurance Code.  However, Plaintiff seeks to amend her Complaint and has filed a Motion for Leave to Amend in order to assert these additional specific violations of the Insurance Code, such as Mont. Code Ann. §33-1-302, prohibiting misrepresentations of material fact in the course of

selling insurance, and Mont. Code Ann. §33-18-201(6), which prohibits

misrepresentations of the facts of policy provisions concerning insurance

coverage.  These two proposed statutory claims allege the same basic set of facts

as the existing negligence and negligence *per se* claims.  "The application of the

United States Arbitration Act . . . should not defeat the application of state law

(including state regulatory legislation) to substantive issues. . . ."  1 Domke on

Comm. Arb. § 7.7.  An arbitrator is thus perfectly capable of applying state

statutes (in this case, Texas statutes) that may be applicable to Plaintiff's claims.

The Court therefore denies the Motion for Leave to Amend not in order to exclude

such statutory claims from arbitration but because the referral to arbitration makes

the motion to amend the complaint moot.

Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion to Compel Arbitration

and Stay Proceedings (Doc. 35) is GRANTED.  This case is referred for

arbitration to the Financial Industry Regulatory Authority, and, pursuant to 9

U.S.C. § 3, all proceedings herein are STAYED pending conclusion of the

arbitration.

IT IS FURTHER ORDERED that Plaintiff's Motion to Amend Complaint is DENIED as moot, and Defendants' Motion for Protective Order to stay expert witness disclosure is GRANTED, for good cause shown.

The Clerk shall notify counsel and FINRA of entry of this order.

Done and Dated this 14th day of March, 2012.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE